UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JEFF LARKIN, | ) |
|    Plaintiff, | ) |
| vs. | ) CV 02-B-1733-S |
| LIFE INSURANCE COMPANY OF NORTH AMERICA, | ) |
|    Defendant. | ) |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 16.)[1] Plaintiff Jeff Larkin has sued defendant Life Insurance Company of North America, alleging that defendant failed to pay benefits due to him under certain insurance policies providing coverage for accidental dismemberment. The policies at issue are qualified ERISA policies. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 16), is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. STATEMENT OF FACTS

At all times relevant to these proceedings, plaintiff was an employee of Siemens Corporation. (Doc. 19, Ex. 2 at 12.) As a benefit of his employment, plaintiff was eligible for coverage under two group accident insurance policies issued by defendant to insure the accidental dismemberment component of Siemens Corporation's employee welfare benefit

plan. (*See* doc. 17, Ex. A ¶¶ 2-4, doc. 19, Ex. 1, ex. 1 at 00008.) The policies contain identical language and state, in bold print on the cover page that, "**THIS IS A LIMITED POLICY**" and further that "**THIS IS AN ACCIDENT POLICY WHICH DOES NOT PAY BENEFITS FOR LOSS FROM SICKNESS**." (Doc. 17, Ex. A, ex. 1 at 00045; ex. 2 at 1.) The policies provide:

> We agree to pay benefits for loss from bodily injuries:
>
> > (a) caused by an accident which happens while an insured is covered by this policy; and
> >
> > (b) which, directly and from no other causes, results in a covered loss.
>
> We will not pay benefits if the loss was caused by:
>
> > (a) sickness, disease, or bodily infirmity; or
> >
> > (b) any of the Exclusions listed in the policy.

(*Id.*, ex. 1 at 00045; *see id.* ex. 2 at 1.) In addition, the policies were amended to add the following exclusion from coverage: "Benefits will not be paid for loss covered by or resulting from sickness, disease, bodily infirmity or medical or surgical treatment thereof . . . ." (*Id.*, ex. 1 at 00047.)

Plaintiff underwent radial keratotomy surgery in both eyes in 1984 to correct nearsightedness; the surgery was somewhat successful, but plaintiff remained in corrective lenses. (Doc. 19, Ex. 2 at 16.) In or around 1995, plaintiff underwent surgery to correct a "retinal problem" in his right eye. (*Id.*) In late 1999 or early 2000, plaintiff began to experience another problem in his right eye that presented as an early cataract. (*Id.* at 19-20.)

3

In preparing for cataract surgery to his right eye, one of plaintiff's treating physicians discovered the retina in his left eye was detached. (*Id.* at 19.) Plaintiff underwent the first of a series of six eye surgeries beginning in April of 2000. (*Id.* at 20.)

On the morning of April 21, 2000, plaintiff checked into the hospital in preparation for eye surgery (*Id.* at 22, 90.) At the time he checked into the hospital, plaintiff believed that he would stay in the hospital overnight following his surgery. (*Id.* at 96.) He stated, "[A]t the time of my surgery I was planning to stay in the hospital overnight as I had been advised by [my physician] Dr. Morris that such a stay was necessary to guard against nausea after surgery, which Dr. Morris very much wanted to avoid." (Doc. 17, Ex. A, ex. 5 at 2.) According to plaintiff, his physicians "took care to talk to the anesthesiologist to try to avoid or at least minimize the nausea." (Doc. 19, Ex. 2 at 47.)

Plaintiff's surgery went smoothly. (*Id.* at 46.) After his surgery, plaintiff remained in the recovery room for approximately three to four hours. (*Id.* at 49-50.) Following plaintiff's recovery period, Dr. Doran, an associate of Dr. Morris, made the decision in the recovery room to discharge plaintiff that day. (*Id.* at 98.) Plaintiff's wife, Susan Larkin, questioned the early release; nevertheless Dr. Doran believed plaintiff did not need to stay in the hospital overnight. (*Id.* at 67.) Plaintiff experienced nausea before discharge. (*Id.* at 24.) Dr. Doran prescribed anti-nausea medication, but plaintiff continued to have nausea. (*Id.* at 88.)

He experienced symptoms of nausea during the approximately twenty-minute ride to his home from the hospital. (*Id.* at 23-24.) He testified he that he "had more violent symptoms as [he] got home." (*Id.* at 25.) He stated:

> When I opened the door to the car, and I don't know exactly what happened when I got out of the car, but I felt extremely nauseated. The urge just overwhelmed me and the next thing I know I'm on the front lawn immediately on my hands and knees.
>
> . . .
>
> . . . And at that time I was basically throwing up as violently as I ever had.
>
> . . .
>
> I felt like my head was going to explode. I don't remember a lot of the details. . . . I do remember feeling so uncontrollably nauseous that I couldn't stop. And all I can think or all that I can remember was how sick I was.

(*Id.* at 26-27.)

Mrs. Larkin called the hospital and told someone that plaintiff had become sick. (*Id.* at 30.) Someone at the hospital called in a prescription to help ease plaintiff's nausea. (*Id.*) Plaintiff spent that night at home. (*See id.* at 31.) The following morning, plaintiff saw Dr. Doran for a previously-scheduled postoperative examination. (*Id.* at 32-33.) When Dr. Doran removed his bandage, plaintiff told Dr. Doran that he could not see out of his left eye. (*Id.* at 34.) Dr. Doran called Dr. Morris, who determined that "there was a major problem" with plaintiff's left eye, apparently caused by a hemorrhage. (*Id.* at 35.)

Following the April 21, 2000, retinal surgery at issue here, plaintiff had a subsequent retinal surgery two weeks later, and three more retinal surgeries in an attempt to restore his

5

vision; the last surgery being performed in early December 2000. (*Id.* at 38.) After these surgeries, plaintiff was told that his vision in that eye was "definitely lost." (*Id.* at 36.)

Plaintiff's doctors advised him before each subsequent retinal surgery that nausea was a possible complication following surgery due to the anesthesia. (*Id.* a 47-48.) Indeed, plaintiff experienced "minor nausea" following his subsequent surgeries. (*Id.* at 48.) He spent the night in the hospital after four of his five subsequent surgeries; after his last surgery, which plaintiff described as a "less procedure," he spent a considerable amount of time in the recovery room before he was released. (*Id.* at 49.)

In April 2001, plaintiff filed a claim for benefits based on the loss of vision in his left eye. (Doc. 17, Ex. A, ex. 3 at 00075.) In describing how he lost his vision in his left eye, plaintiff stated, "On 4/21/00, I had surgery to repair a detached retina in my left eye. Later that evening at home, I suffered an unexpected, severe hemorrhage in my left eye causing severe and permanent damage which resulted in the total and irrecoverable loss of sight in my left eye." (*Id.* at 00064.)

In support of his claim, Greer L. Geiger, M.D., whom plaintiff had seen for a second opinion, sent a letter to plaintiff's employer, which was included in plaintiff's claims file before defendant. (*See id.* at 00066.) Dr. Geiger stated in her letter:

> My initial evaluation of Mr. Larkin revealed that he has sustained an optic neuropathy in his left eye . . . . Retinal surgery is not directly associated with an injury to the optic nerve. Optic neuropathy is most commonly associated with a blockage in circulation which can occur during the peri-operative period. It would not be a direct result of surgery, though it can occur indirectly. As I was not involved in his acute care, I am not able to add

6

anything more as I was not examining him during the acute phase of his problem.

(*Id.*)

Also, in support of plaintiff's claim, defendant considered a Clinical Summary prepared by Dr. Morris and dated March 21, 2001. (*Id.* at 00069-00070.) Dr. Morris stated:

> . . . On or about April 17, [2000,] after being seen by myself and Dr. Witherspoon, we recommended surgical repair of the retinal detachment in the LEFT eye along with completion of laser prophylaxis in the RIGHT eye under general anesthesia. This was performed without difficulty on April 21.
>
> [Plaintiff] suffered severe nausea and vomiting the night after the retinal detachment repair in the LEFT eye, and on the next morning was noted to have hemorrhagic choroidal detachment, hemorrhage within the vitreous cavity and anterior chamber, and severe pressure rise. . . .
>
> . . .
>
> The LEFT eye has no useful vision at this time but carries a potential of modest ambulatory vision. . . .
>
> ***The complications in the LEFT eye which led to a visual loss all emanated from a severe hemorrhage inside the LEFT eye apparently resulting from severe postoperative nausea and violent vomiting following [a] repair of a retinal detachment in the LEFT eye on April 21, 2001[,] which had not been accompanied by any intraoperative difficulties***. This hemorrhage in turn led to secondary glaucoma, extensive intravitreal and anterior chamber hemorrhage, the development of proliferative vitreoretinopathy, traction retinal detachment, recurrent scar formation despite silicone oil, mydriasis, and finally pallor of the optic nerve. The paleness of the optic nerve in the LEFT eye has no discernable direct cause, however, it has been noted by retinal surgeons in a significant number of patients who have recurrent retinal detachment from proliferative vitreoretinopathy and who require multiple operations to repair, along with peripheral laser treatment.

(*Id.* at 00069-00070 (emphasis added).)

7

On July 11, 2001, defendant notified plaintiff by telephone "that based on the information contained in the file his claim was not payable." (Doc. 17, Ex. A, ex. 7 at 00062.) The following day, on July 12, 2001, defendant issued plaintiff a formal letter, (*id.* at 59), which advised plaintiff that his claim had been declined because:

> [1] "The records indicate that your loss of vision was the result of a hemorrhage inside your left eye resulting from severe postoperative nausea and violent vomiting following a repair of a retinal detachment. Since nausea and vomiting are the result of sickness, disease or bodily infirmity, [plaintiff's] loss of sight was due to disease rather than to accident[;]" and
>
> [2] The records indicate that your loss vision was the result of a hemorrhage inside your left eye resulting from severe postoperative nausea and violent vomiting following a repair of retinal detachment. Since the loss was the result of severe postoperative nausea and violent vomiting, [your loss of sight] was a of the surgery, rather than an accident."

(*Id.* at 00060.)

Plaintiff appealed defendant's claims determination. (*Id.* at 00054-55.) In his appeal letter, plaintiff stated, *inter alia*,

> At the time of my surgery, I was planning to stay in the hospital overnight as I had been advised by Dr. Morris that such a stay was necessary to guard against nausea after surgery, which Dr. Morris very much wanted to avoid. Yet, I was promptly discharged by Dr. Doran, Dr. Morris'[s] associate, despite my post-operative nausea. Upon arrival at home, I fell to the ground and also began severely vomiting. I contacted the hospital after the fall and at the onset of my vomiting and was not given permission to return to the hospital.
>
> Based upon the reasons stated above, I feel that my claims should not have been denied. The medical notes of both Dr. Morris and Dr. Geiger establish that the optic neuropathy causing the loss of vision in my left eye is an accidental bodily injury and I am entitled to have the insurance and dismemberment benefits paid to me for my loss.

(*Id.* at 00055.)

8

Defendant reviewed plaintiff's claim and "concluded that [its] original decision was proper and [that] no benefits are payable." (*Id.* at 00051.) Defendant stated:

> You indicated in your letter that both doctors [Drs. Morris and Geiger] indicated in their notes that your loss of vision was due to optic neuropathy, which was from an accidental injury. We do not dispute that your loss of vision was due to optic neuropathy; however, the records do not show that this condition was the result of an accidental injury. Dr. Geiger . . . did not know what caused the optic nerve problem. [Sh]e thought that it might have occurred as an indirect result of surgery. Dr. Morris . . . also expressed uncertainty as to the cause.
>
> An accident is understood to mean a single sudden external event. Nothing in the medical records that we have show that your loss was . . . due to a single sudden external event. If the surgery is considered the external event then the loss would not be covered because the policy . . . does not cover such losses. Further, the records show that the surgery was necessary to repair a retinal detachment. However, nothing in the file indicates that this detachment was the result of any single sudden external event. The severe nausea and vomiting that followed would be considered a sickness, disease or bodily infirmity. As stated above, losses due to sickness, disease or bodily infirmity are not covered. Thus, our initial decision to deny the claim was proper.

(*Id.* at 00052.)

In his opposition to defendant's Motion for Summary Judgment, plaintiff has submitted the Affidavit of Dr. Morris, in which Dr. Morris testified that plaintiff told him "that he experienced severe nausea and violent vomiting and fell to his knees." (Doc. 19, Ex. 3 ¶ 6.) Dr. Morris testified that plaintiff "experienced a hemorrhage which resulted in loss of sight to his left eye," as the result of "the initial violence of the fall and the violent shaking accompanying the vomiting." (Doc. 19, Ex. 3 ¶¶ 7-8.) He further stated, "In my opinion, nausea is merely a temporary condition and is not considered to be a sickness, disease or bodily infirmity. Vomiting, likewise, is a natural bodily function and does not usually result

9

in blindness. In my opinion, vomiting is not a sickness, disease or bodily infirmity, but is merely a temporary indisposition." (*Id.* ¶ 9.)

### III. DISCUSSION

#### A. PLAINTIFF'S CLAIM FOR BENEFITS

The central issues before the court on plaintiff's claim for benefits are whether plaintiff's loss was the result of an "accident," and, whether the loss is excluded from coverage under the "sickness, disease, bodily infirmity or medical or surgical treatment therefore" exclusions.[2] The parties agree that plaintiff bears the burden of establishing a covered injury under the terms and conditions of the policies. To establish coverage, plaintiff must show that his loss of vision in his left eye: (1) was "caused by an accident" that (2) "directly and from no other causes result[ed] in a covered loss." (Doc. 17, Ex. A, ex. 1 at 00045.) Also, he must establish that his loss of vision was not the result of a "sickness, disease, bodily infirmity or medical or surgical treatment thereof." (*Id.* at 00047.)

The policies at issue do not define the term "accident" and the ERISA statute does not address the proper construction of the term. Therefore, the court will look to "the federal common law of ERISA to give some unity to the concept of 'accident.'" *Buce v. Allianz Life Insurance Co.*, 247 F.3d 1133, 1147 (11th Cir. 2001).

---

[2] The parties agree that defendant's denial of plaintiff's accidental dismemberment benefits should be reviewed under a *de novo* standard because the claims administrator did not expressly retain the right to construe plan terms. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

10

The definition of the term "accident" under an ERISA accidental death or dismemberment policy "differ[s] slightly depending on whether the definition must be applied to a case involving allegedly voluntary conduct on the part of the insured, or to a case involving the need to distinguish between 'illness' and 'accident.'" Lee R. Russ in consultation with Thomas F. Segalla, 10 COUCH ON INSURANCE § 139:16 (3d ed. 1998)[hereinafter "COUCH ON INSURANCE"]. "[I]njuries caused not by the illness itself but by the treatment of the illness could logically be assigned to either the illness or accident categories, but . . . the normal understanding is that they belong with illness, not with accident." *Id.*; *see also id.* n.87 (citing, *inter alia*, *Senkier v. Hartford Life and Accident Insurance Co.*, 948 F.2d 1050, 1051-52 (7th Cir. 1991)). In *Senkier v. Hartford Life and Accident Insurance Co.*, the Seventh Circuit Court of Appeals held, "When you [suffer a loss] from the standard complications of standard medical treatments you don't, it seems to us, [suffer a loss] in or because of an accident; your [loss] is a result of an illness." *Senkier*, 948 F.2d at 1053.

Plaintiff contends that he lost the vision in his left eye as a result of an accident, which he describes as "[t]he fall and shaking." (Pl. Mem. in Opp. to Mot. for Summ. J. at 4.) The record demonstrates that plaintiff experienced postoperative nausea because of surgery to correct his detached left retina, which plaintiff had been told was a possible complication of his surgery. Such nausea caused him to fall and vomit violently. Dr. Morris testified that plaintiff's "fall and shaking was the cause of his loss of vision." (*Id.* (citing doc. 19, Ex. 3 ¶¶ 7, 8).)

11

The court finds that plaintiff's fall and shaking, caused by postoperative nausea, a standard complication of the surgery to correct plaintiff's detached retina, was not an accident. Therefore, the court finds that plaintiff did not lose his vision as a result an accident, but he lost his vision because of a complication following surgical treatment to correct a detached retina. *See Senkier*, 948 F.2d at 1053.

Plaintiff also contends that defendant cannot establish that his surgery was treatment for a "sickness, disease, [or] bodily infirmity," (doc. 17, Ex. A, ex. 1 at 00047), because the "detached retina in his left eye was *not* a sickness, disease, or bodily infirmity, (Pl. Mem. in Opp. to Mot. for Summ. J. at 7 (emphasis in original).) Plaintiff contends the surgery was not treatment for a sickness, disease, or bodily infirmity because he had 20/20 vision in his left eye before surgery . (*Id.*)[3]

*Black's Law Dictionary* defines the term "disease" as "A deviation from the healthy and normal functioning of the body." BLACK'S LAW DICTIONARY 480 (7th ed. 1999).

---

[3] Dr. Morris, in his Clinical Summary of plaintiff's medical treatment, noted:

> "In the LEFT eye visual acuity upon presentation was 20/20[;] however, [plaintiff] was noted to have rhegmatogenous retinal detachment caused by multiple round defects in lattice degeneration temporally. The detachment extended from 2:00 to 4:00, and extended significantly posterior to the equator to within 5DD of the fovea. On or about April 17, after being seen by myself and Dr. Witherspoon, we recommended surgical repair of the retinal detachment in the LEFT eye . . . . This was performed without difficulty on April 21.

(Doc. 17, Ex. A, ex. 3 at 00069.)

Similarly, *Couch on Insurance* states, "The word 'disease', as used in an accident policy excepting from coverage loss caused by such directly or indirectly, wholly or in part, implies a condition which either has impaired, or presumably will impair, if it continues in its usual course of progress, the normal working of some of the bodily or mental functions." COUCH ON INSURANCE § 141:32 (citing *Dickerson v. Hartford Acc. & Indem. Co.*, 105 P.2d 517 (Ariz. 1940)). The term "disease" does not include temporary or slight ailments. *Fidelity Service Insurance Co. v. Jones*, 191 So.2d 20, 27 (Ala. 1966), *cited in Paulissen v. U.S. Life Insurance Co.*, 205 F. Supp. 2d 1120, 1129 (C.D. Cal. 2002).[4]

---

[4]The court in *Paulissen* stated:

> Sickness, disease, and illness have broad, generic definitions. *See, e.g., Fidelity Serv. Ins. Co. v. Jones*, 280 Ala. 195, 191 So.2d 20, 27 (1966)("'The ordinary definition of the word [disease] is: Any derangement of the functions or alteration of the structure of the animal organs. This, as you will see, would include the slightest and most temporary ailment.'")(quoting *Meyer v. Fidelity & Casualty Co.*, 96 Iowa 378, 65 N.W. 328, 329 (Iowa 1895))(internal quotation omitted); *Zuckerman v. Underwriters at Lloyd's London*, 42 Cal. 2d 460, 475, 267 P.2d 777 (1954)(*en banc*); Black's Law Dictionary 480 (7th ed. 1999)(defining disease as "[a] deviation from the healthy and normal functioning of the body"). But, as in the Ninth Circuit's decision in *Wilson* [*New York Life Ins. Co. v. Wilson*, 178 F.2d 534, 536 (9th Cir. 1949)(as amended)], the definitions are narrowly construed in the context of insurance policies. In particular, temporary conditions and indispositions are not considered to be diseases. *See Jones*, 191 So.2d at 26 ("'as the imperfect working is not permanent, and the body returns at once, or in a short period of time, to its normal condition, it does not rise to the dignity of a disease'")(quoting *Manufacturers' Accident Indemnity Co. v. Dorgan*, 58 F. 945, 951 (6th Cir. 1893)); *id.* at 27 ("'A mere temporary disorder, that was new or unusual with him, arising out of some sudden and unexpected derangement of the system ... would not be a "disease"'")(quoting *Meyer*, 65 N.W. at 329).

*Paulissen*, 205 F. Supp. 2d at 1129-30.

13

The evidence demonstrates that plaintiff's retina in his left eye was detached and that his treating physicians recommended surgery to correct it. (*See* doc. 17, Ex. A, ex. 3 at 00069; doc. 19, Ex. 2 at 19-20.) "The retina is a nerve layer in the back of the eye that senses light and sends images to the brain . . .; if it is detached, the retina does not work and if left untreated, a detached retina can result in permanent vision loss or blindness." *Thomas v. Arevalo*, No. 95 CIV. 4704(SS), 1998 WL 427623, *3 (S.D.N.Y. Jul. 28, 1998). "Retinal detachments are generally visually asymptomatic until the detachment reaches the macula. Once that portion of the retina begins to detach, a patient experiences a shadow or curtain-like loss of vision, culminating in a sudden and dramatic blur." *Malaterre v. Minot Eye, Ear, Nose and Throat Clinic, P.C.*, No. CIV A2-95-167, 1999 WL 33283323, *9 (D.N.D. Apr. 12, 1999). Therefore, the court finds that a detached retina is a disease, as it is an impairment that, if left untreated, will result in a loss of the ability to see, which is unquestionably a bodily function. *See* COUCH ON INSURANCE § 141:32; BLACK'S LAW DICTIONARY 480 (7th ed. 1999). The fact that, at the time of his surgery, plaintiff's detached retina had not yet caused an actual loss of vision does not change the court's finding that a detached retina is a disease under the terms of the policies at issue.[5]

Plaintiff's retinal detachment was treated with surgery under general anesthesia. As a result, plaintiff suffered postoperative nausea, which, in turn, caused plaintiff to vomit violently. The record evidence demonstrates that plaintiff's loss of vision resulted, in whole or in part, from his post-operative nausea with vomiting, which was a complication of

---

[5] If a detached retina is not a disease, it is unquestionably a bodily infirmity.

14

plaintiff's surgical treatment for his detached retina. Nothing in the record indicates that plaintiff's nausea with violent vomiting, a complication of the surgical treatment for his detached retina, was unrelated to the severe hemorrhage in his left eye that caused his loss of vision.

Therefore, the court finds that plaintiff's loss of vision was not caused, directly and from no other causes, by an "accident." The court finds that plaintiff's claim for benefits based on his loss of vision is excluded from coverage because his loss of vision is a "loss . . . resulting from [a] disease . . . or . . . surgical treatment thereof . . .," (doc. 17, Ex. A, ex. 1 at 00047), and not a loss occurring "directly and from no . . . causes" other than by accident, (*id.* at 00045).

Therefore, defendant's Motion for Summary Judgment as to plaintiff's claim for benefits will be granted, and such claim will be dismissed.

## B. CLAIM FOR FIDUCIARY BREACH

In his Amended Complaint, plaintiff alleges defendant breached its fiduciary duty. (Doc. 10 ¶ 7.) Defendant contends that plaintiff cannot maintain a claim based on an alleged breach of fiduciary duty in violation of Section 502(a)(3), 29 U.S.C. § 1132(a)(3),[6] because

---

[6]Section 1132(a)(3) provides:

(a)  Persons empowered to bring a civil action

A civil action may be brought –

> . . .
>
> > (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or

he can maintain a claim for alleged unpaid benefits pursuant to Section 502(a)(1)(B), §1132(a)(1)(B).[7] (*See* Def. Memorandum in Supp. of Mot. for Summ. J. at 18-20.) Defendant is correct. The Eleventh Circuit has held "that an ERISA plaintiff who has an adequate remedy under Section 502(a)(1)(B) cannot alternatively plead and proceed under Section 502(a)(3)." *Ogden v. Blue Bell Creameries U.S.A., Inc.*, 348 F.3d 1284, 1287 (11th Cir. 2003)(citing *Katz v. Comprehensive Plan of Group Insurance*, 197 F.3d 1084, 1088-89 (11th Cir.1999). Therefore, defendant's Motion for Summary Judgment as to such claim will be granted, and that claim will be dismissed.

---

practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3).

[7]Section 1132(a)(1)(B) provides:

(a) Persons empowered to bring a civil action

A civil action may be brought –

(1) by a participant or beneficiary –

. . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

29 U.S.C. § 1132(a)(1)(B).

16

## V. <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE** this ___29th___ day of March, 2004.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge